Guy Ruttenberg, Bar No. 207937
guy@ruttenbergiplaw.com
Michael Eshaghian, Bar No. 300869
mike@ruttenbergiplaw.com
RUTTENBERG IP LAW,
A PROFESSIONAL CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, CA 90067
Telephone: (310) 627-2270
Facsimile: (310) 627-2260

*Attorneys for Defendant Ziff Davis, LLC*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL GRECCO PRODUCTIONS, INC. d/b/a MICHAEL GRECCO PHOTOGRAPHY, INC., <br><br> Plaintiff, <br><br> v. <br><br> ZIFF DAVIS, LLC; and DOES 1 through 10 inclusive, <br><br> Defendants. | Case No. 2:19-cv-04776-DSF-JC <br><br> **[REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL]** <br><br> **DEFENDANT ZIFF DAVIS' OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY** <br><br> Date:    August 16, 2021 <br> Time:    1:30 PM <br> Courtroom: 7D <br> Judge:    Hon. Dale S. Fischer |

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................1

II.   FACTUAL BACKGROUND...............................................................1

III.  PROCEDURAL BACKGROUND .......................................................4

IV.   LEGAL STANDARD .........................................................................5

V.    ARGUMENT .......................................................................................6

    A.    MGP Has Waived Any Conflict or Disqualification. ..............7

    B.    MGP Was Never a Prospective Client. ....................................8

    C.    MGP's Inquiry Is Not Substantially Related to this Case.......14

    D.    The Information MGP Disclosed to RIPL Is Not Confidential at All. .......................................................................................16

VI.   CONCLUSION..................................................................................20

# TABLE OF AUTHORITIES

Cases

*Cal. Self-Insurers' Security Fund v. Superior Court*,
   19 Cal. App. 5th 1065 (2018) ...................................................................6

*Caldwell v. City of San Francisco*,
   No. 12-cv-01892-DMR, 2021 WL 242867 (N.D. Cal. Jan. 25, 2021)...............6, 12

*Evangelatos v. Superior Court*,
   44 Cal. 3d 1188 (1988) .........................................................................6

*Export-Import Bank of Korea v. ASI Corp.*,
   No. CV162056MWFJPRX, 2019 WL 8200603 (C.D. Cal. Jan. 16, 2019) ............16

*Faraday&Future, Inc. v. EVelozcity, Inc.*,
   No. CV 18-737-DMG (RAOx), 2018 WL 4849704 (C.D. Cal. May 30, 2018) .....17

*Fremont Indemnity Co. v. Fremont General Corp.*,
   143 Cal. App. 4th 50 (2006) ...................................................................15

*Gentry v. State Farm Mut. Automobile Ins. Co.*,
   No. CIV. S-09-0671 LKK/GGH, 2009 WL 10693206 (E.D. Cal. Sept. 4, 2009).....7

*Golden v. Michael Grecco Prods, Inc.*,
   No. 19CV3156NGGRER, 2021 WL 878587 (E.D.N.Y. Mar. 9, 2021).................18

*Grecco v. Associated Press*,
   No. 16-cv-6240 (VEC), 2017 WL 2913501 (S.D.N.Y. July 7, 2017)....................18

*In re EXDS, Inc.*,
   No. C05-0787 PVT, 2005 WL 2043020 (N.D. Cal. Aug. 24, 2005 .........................8

*in re Johnson*, N
   o. 96-O-05705, 2000 WL 1682427 (Cal. Bar Ct. Oct. 26, 2000).........................20

*In re Marriage of Zimmerman*,
   16 Cal. App. 4th 556 (1993) ...................................................................13

*In re Marvel*,
   251 B.R. 869 (Bankr. N.D. Cal. 2000), *aff'd* 265 B.R. 605 (N.D. Cal. 2001) ......6, 8

OPPOSITION TO MOTION TO DISQUALIFY

*In re Wu*,

   No. 95-O-16652, 2001 WL 1511529 (Cal. Bar Ct. June 5, 2001) ...........................6

*IPVX Patent Holdings, Inc. v. 8x8, Inc.*,

   No. 4:13-cv-01707 SBA (KAW), 2013 WL 6700303 (N.D. Cal. Dec. 19, 2013)..12

*Kuyou Sports Goods Co. v. Fountain Inc.*,

   No. SACV 17-00426 JVS(KESx), 2017 WL 5172239 (C.D. Cal. Jun. 19, 2017).12, 17

*Li v. A Perfect Day Franchise, Inc.*,

   No. 11-cv-01189-LHK, 2011 WL 4635176  (N.D. Cal. Oct. 5, 2011) ..................12

*Michael Grecco Prods, Inc. v. BDG Media Inc.*,

   No. CV 19-04716-AB, 2020 WL 3957565 (C.D. Cal. Feb. 26, 2020) ...............1, 17

*Michael Grecco Prods., Inc. v. Alamy Inc.*,

   No. 18-CV-3260 (PKC) (JO), 2020 WL 5848613 (E.D.N.Y. Oct. 1, 2020)...........18

*Michael Grecco Prods., Inc. v. Enthusiast Gaming, Inc.*,

   No. 19-cv-06399-LHK (N.D. Cal. Dec. 8, 2020) ....................................................18

*Michael Grecco Prods., Inc. v. UMG Recordings, Inc.*,

   No. 1:17-cv-01384-JGK, Dkt. No. 1 (S.D.N.Y. Feb. 23, 2017 ...............................18

*Michael Grecco Prods., Inc. v. Valuewalk, LLC*,

   345 F. Supp. 3d 482 (S.D.N.Y. 2018) ....................................................................18

*Michael Grecco Prods., Inc. v. Wenn Ltd.*,

   No. 17-cv-1843, Dkt. No. 1 (S.D.N.Y. Mar. 13, 2017).........................................1, 19

*Shurance v. Planning Control Int'l, Inc.*,

   839 F.2d 1347 (9th Cir. 1988) ..............................................................................6, 8

*SkyBell Techs., Inc. v. Ring, Inc.*,

   No. SACV1800014JVSJDEX, 2018 WL 6016156 (C.D. Cal. Sept. 18, 2018)......20

Rules/Statutes

Cal. Bus. & Prof. Code § 6077 ....................................................................................6

Cal. Rules of Professional Conduct Rule 1.18 ...................................................passim

## I.   __INTRODUCTION__

Two years after Ruttenberg IP Law ("RIPL") began its representation of Defendant Ziff Davis, LLC ("Ziff Davis") in connection with this lawsuit, Plaintiff Michael Grecco Productions, Inc. ("MGP") filed a belated motion to disqualify. In its motion, MGP claims that RIPL obtained confidential information from MGP in 2018 via (i) a unilateral email sent to the wife of Ziff Davis' lead counsel Guy Ruttenberg that contains general, non-specific, non-confidential information and (ii) a brief conversation with an associate at RIPL who has never worked on this case. Notably, the information disclosed to RIPL by MGP had nothing to do with this case, let alone with Ziff Davis. Unfortunately, MGP has resorted to using its motion as an unfair tactical tool in its lawsuit against Ziff Davis. The Court should not countenance this effort and should deny MGP's motion.

## II.   __FACTUAL BACKGROUND__

<u>Michael Grecco Productions</u>

Mr. Michael Grecco is the head of MGP, which purports to be "a professional media and photography company." (Dkt. No. 26-1 ¶ 9). MGP is also a serial filer of copyright infringement cases. (Dkt. Nos. 29-2 ¶ 5, 29-4). MGP purports to "meticulously" protect its "intellectual property against infringement" and makes no secret of its strategies. *Michael Grecco Prods., Inc. v. Wenn Ltd.*, No. 17-cv-1843, Dkt. No. 1 at 1–2 (S.D.N.Y. Mar. 13, 2017); *see also Michael Grecco Prods, Inc. v. BDG Media Inc.*, No. CV 19-04716-AB, 2020 WL 3957565, at *2 (C.D. Cal. Feb. 26, 2020) ("Plaintiff monitors infringements in-house through publicly available tools such as Google Image Search."); https://labusinessjournal.com/news/2016/oct/21/photographers-focused-online ("Grecco said he is slogging through 35,000 possible instances of copyright infringement and he works with a team of eight law firms.").

Apart from Mr. Grecco, the staff of MGP includes an admin, Torina Yamada, a part-time archivist (Ms. Mykle Parker) and an intern. (Ex. 1 at 17:12-18:21).

1    Michael Grecco is also the founder of two successive businesses— "Image

2    Defenders," and "Titan Copyright"—which enable photographers to monetize their

3    copyrights through litigation. (Ex. 1 at 25:19-31:2). Mr. Grecco started "Image

4    Defenders" as a partnership with Mr. Higbee of the Higbee law firm (*i.e.*, Plaintiff's

5    counsel of record in this case), but later switched to a different partner and restarted

6    the business under the Tian name. (*Id.*) According to its website, "TITAN exists to

7    enable photographers and agencies to safeguard the use of their work online. The

8    TITAN system includes the use of an online platform and sophisticated search

9    capability, in-house legal analysts and copyright experts, and a hands-on customer

10   support team. Our clients assign us approved infringement claims and we pursue

11   them." (https://titancopyright.com/). Per its "How it Works" page, Titan "will engage

12   legal counsel – on a contingency basis" and the copyright owner receives "50% of the

13   total license fees and/or damages recovered." (https://titancopyright.com/how-it-

14   works/). Mr. Grecco's role as a founder of Titan is expressly disclosed on the

15   website. (https://titancopyright.com/about/).

Ruttenberg IP Law and Its Relationship with Ziff Davis

16
17   RIPL is a boutique law firm run by attorney Guy Ruttenberg. (Ruttenberg Decl.

18   ¶ 2). Bassil Manadat was an associate at RIPL in 2018, although he has since

19   departed the firm. (*Id.* ¶ 6). Ms. Jean Lee was an admin at RIPL in 2018, although she

20   left the firm in around August 2019. (*Id.* ¶ 7).

21   RIPL has represented Ziff Davis and its affiliates in more than two dozen

22   matters for more than six years. (Ruttenberg Decl. ¶ 4). RIPL has been Ziff Davis'

23   counsel of record from the outset of the instant litigation. (*Id.* ¶ 5). RIPL has never

24   solicited MGP as a client. (*Id.* ¶ 8).

MGP's Limited Contacts with RIPL

25
26   On March 27, 2018, MGP's representative Torina Yamada unilaterally reached

27   out to Mr. Ruttenberg's wife (Ms. Hassid) explaining that her boss (Michael Grecco)

28   ████████████████████████████████████████████████████████ (Dkt. No.

OPPOSITION TO MOTION TO DISQUALIFY

76-1 at Ex. C). Ms. Hassid had previously worked as a criminal defense attorney (not through RIPL). (Ruttenberg Decl. ¶ 9). Ms. Yamada had been an assistant for Ms. Hassid more than a decade ago before Mr. Ruttenberg and Ms. Hassid were married. (*Id.*).

Neither Ms. Hassid nor Mr. Ruttenberg had invited Ms. Yamada's March 27 email, much less any confidential information. (*See* Ex. 1 at 165:1-18; 169:1-4). According to Ms. Yamada's email, Grecco was ███████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████ (Dkt. No. 76-1 at Ex. C). Ms. Hassid responded that, "Guy [Ruttenberg] does some IP work, he's going to ask around and see if he knows anybody who can help out with this." (*Id.*). On March 28, 2018, Ms. Yamada added, ███████████████████████████ ████████████████ (*Id.*). On April 10, 2018, Ms. Yamada followed up with Ms. Ruttenberg, "Do you think Guy would take a phone call with Michael next week? He's really eager, and so am I, to get them connected." (*Id.*).

On April 10, 2018, Ms. Yamada followed up again with Ms. Hassid, who responded that she was in the hospital (with Mr. Ruttenberg) giving birth. (Dkt. No. 76-1 at Ex. A). On April 10, Ms. Hassid added Mr. Ruttenberg to the email chain for the first time (*id.*), but there was no response on that email chain from Mr. Ruttenberg or anyone at RIPL. Mr. Ruttenberg has no recollection of reading that email chain. (Ruttenberg Decl. ¶¶ 11–12).

Instead, on April 12, 2018, Ms. Yamada started a new email chain with an email directly to Mr. Ruttenberg, without any of the information in her prior exchange with Ms. Hassid. (Dkt. No. 76-1 at Ex. B). Ms. Yamada congratulated Mr. Ruttenberg on the new baby, and added, "my boss Michael Grecco is eager to get on a call with you about his needs. I know you're really busy right now, so if you have a partner or associate you'd like to take the call for you, that'd be great too." (*Id.*).

1  Mr. Ruttenberg was still in the hospital with his wife when Ms. Yamada's new
2  email came in. (Ruttenberg Decl. ¶¶ 10–11). Mr. Ruttenberg forwarded the new
3  message to his associate Mr. Madanat, who scheduled a call with Mr. Grecco and Ms.
4  Yamada regarding their request for a referral. (Dkt. No. 76-1 at Ex. B). Mr. Madanat
5  is not copied of any of the prior emails with MGP and did not receive them. (Madanat
6  Decl. ¶ 4).

7  On April 13, 2018, Mr. Madanat, Mr. Grecco and Ms. Yamada had a call that
8  Mr. Grecco describes as "preliminary." (Ex. 1 at 177:7–12). Mr. Grecco does not
9  have a specific recollection of the call. (*Id.* at 197:7–11). Based on his (and RIPL's)
10 ordinary practice, Mr. Madanat would have advised Ms. Yamada and Mr. Grecco that
11 they should not divulge any confidential information during such a call.  (Madanat
12 Decl. ¶ 6; Ruttenberg Decl. ¶ 13). At a high-level, Mr. Grecco explained that he was
13 seeking counsel to assist other photographers assert copyright infringement claims.
14 (Madanat Decl. ¶ 7). The discussion had nothing to do with Ziff Davis or even Mr.
15 Grecco's own copyright claims. (*Id.* ¶¶ 7, 9). After a brief discussion between Mr.
16 Madanat and Mr. Ruttenberg, RIPL declined any further assistance. (*Id.* ¶ 7). Mr.
17 Madanat has never worked on the instant matter. (*Id.* ¶ 3).

18 **III.  PROCEDURAL BACKGROUND**

19 MGP filed suit against Ziff Davis on May 31, 2019. (Dkt. No. 1). RIPL first
20 appeared as counsel through communications with MGP's counsel on June 28, 2019
21 and, later, appeared on filings with the Court. (Dkt. No. 13; Ruttenberg Decl. ¶ 5).
22 RIPL has been counsel for Ziff Davis throughout this matter.

23 On November 18, 2019, the Court dismissed MGPs claims based on the statute
24 of limitations and entered judgment in favor of Ziff Davis. (Dkt. Nos. 34, 35). On
25 appeal, the Ninth Circuit reversed, explaining "it is not clear from the face of the
26 [FAC] that MGP's copyright infringement claims were untimely." (Dkt. No. 46 at 2).
27 The Ninth Circuit added, "For example, whether the Google reverse image search
28 technology would have captured the images is a question of fact, inappropriate for

dismissal at the motion to dismiss stage." (*Id.*). The Ninth Circuit suggested that, on remand, the district court may order limited discovery that focused on the statute of limitations question, which the parties and this Court agreed to do. (*Id.*; Dkt. Nos. 51, 52, 54).

On March 19, 2021, the Court ordered the parties to provide Rule 26(a) initial disclosures relating to the statute of limitations defense. (Dkt. No. 54). In its disclosures, MGP identified Mr. Grecco and Ms. Yamada as witnesses it would use in support of its position. (Ex. 2). Thus, on May 28 and June 3, 2021, Ziff Davis noticed MGP, Mr. Grecco and Ms. Yamada for depositions, and the parties later confirmed that the witnesses would be deposed on July 1 and 2, 2021. (Dkt. No. 69 at 1:12-14).

On June 24, 2021, MGP filed an *ex parte* application to stay discovery pending resolution of its motion to disqualify, which MGP later filed on June 28, 2021. (Dkt. Nos. 58, 62). The Court denied the *ex parte* application to stay on June 30, 2021. (Dkt. No. 68). After the Court denied MGP's *ex parte* application, MGP and its witnesses (Mr. Grecco and Ms. Yamada) still failed to appear for their previously scheduled deposition on July 1 and 2, 2021. (Dkt. No. 69 at 1:21-24). Ultimately, Mr. Grecco's deposition proceeded on July 13 and Ms. Yamada's on July 23. (Ruttenberg Decl. ¶ 14). Both witnesses were also designated with respect to certain Rule 30(b)(6) topics. (*Id.*).

## IV.   <u>LEGAL STANDARD</u>

Motions to disqualify are highly disfavored and "subjected to particularly strict scrutiny." *Shurance v. Planning Control Int'l, Inc.*, 839 F.2d 1347, 1349 (9th Cir. 1988); *see also In re Marvel*, 251 B.R. 869, 871 (Bankr. N.D. Cal. 2000), *aff'd* 265 B.R. 605 (N.D. Cal. 2001) (motion for disqualification is "drastic measure which courts should hesitate to impose except when of absolute necessity"). Even if an ethical violation is found, "[i]ndividual assessment of the facts, rather than automatic disqualification, is a modern rule that better reflects the current realities of law firm life in the 21st century." *Cal. Self-Insurers' Security Fund v. Super. Ct.*, 19 Cal. App.

5th 1065, 1078 (2018). A party seeking disqualification bears "a heavy burden and must satisfy a high standard of proof," and "[w]hether to disqualify counsel for a conflict of interest is within the trial court's discretion." *Caldwell v. City of San Francisco*, No. 12-cv-01892-DMR, 2021 WL 242867, at *3 (N.D. Cal. Jan. 25, 2021).

## V.    **ARGUMENT**

Even assuming Rule 1.18 governs here,[1] MGP's motion should be denied. MGP was never a "prospective client" within the meaning of Rule 1.18. MGP's brief and unsolicited discussions with RIPL did not include anything related to Ziff Davis or the instant litigation, much less anything confidential. MGP sent a unilateral email (which no one at RIPL read) to counsel's wife seeking ████████████ ████████████. Mr. Ruttenberg was unavailable and did not respond. MGP then started a new email thread (containing nothing that MGP alleges to be confidential), asking to speak with an associate, who had a brief non-confidential discussion and reported back that RIPL declines any assistance. It is not entirely clear that MGP was even seeking counsel for itself.

On the other hand, Ziff Davis is one of RIPL's long-standing clients. RIPL has represented Ziff Davis and its affiliates in over two dozen matters—including well before MGP reached out through Ms. Yamada's emails in 2018. RIPL has also represented Ziff Davis in this case for over two years now—until recently, without any objections from MGP. MGP's motion should be denied.

---

[1] MGP alleges that it approached RIPL in March and April 2018, but Rule 1.18 was only adopted in May 2018 and (as MGP concedes) it was only effective as of November 1, 2018. (Mot. at 6:5-8). Such rules of professional conduct are only binding "***when*** approved by the Supreme Court." Cal. Bus. & Prof. Code § 6077 (emphasis added). Rules are not retroactive. *See In re Wu*, No. 95-O-16652, 2001 WL 1511529, at *4 (Cal. Bar Ct. June 5, 2001) ("we deem it appropriate to apply the rules for statutory interpretation to such rules."); *see also Evangelatos v. Super. Ct.,* 44 Cal. 3d 1188, 1208–1209 (1988) (absent express retroactivity provision or clear extrinsic justification, statute should not be applied retroactively).

**A. MGP Has Waived Any Conflict or Disqualification.**

As a threshold matter, MGP has long avoid waived any arguments concerning disqualification or a conflict. As MGP concedes, RIPL has been counsel of record in this action for more than two years, including before and after an appeal. That warrants denial of MGP's motion. *See Gentry v. State Farm Mut. Automobile Ins. Co.*, No. CIV. S-09-0671 LKK/GGH, 2009 WL 10693206, at *7 (E.D. Cal. Sept. 4, 2009) (waiver found after 22-month delay).

According to Mr. Grecco, MGP is not a large organization. Mr. Grecco contends that both he and Ms. Yamada—who are two of MGP's three employees—had discussions with RIPL. (Ex. 1 at 17:9–21, 177:4–25). In his recent deposition, Mr. Grecco even testified that he had a second call directly with Mr. Ruttenberg. (*Id.* at 174:13–25, 177:4–25). If those discussions were as meaningful as Mr. Grecco now claims, MGP could have and should have raised this issue long ago.

At this juncture, disqualification would not serve any legitimate purpose. As explained in more detail below, RIPL never had any confidential information belonging to MGP, much less anything that was or could be used in this litigation. But more importantly, MGP does not really explain how disqualification would remedy any concerns ***now***. Subpoenas have already been served. Key depositions have already occurred, including depositions of Mr. Grecco, Ms. Yamada and a Rule 30(b)(6) deposition of MGP.[2] And this discovery has taken place without so much as a Protective Order regarding confidentiality, much less any restrictions on the client's ability to receive information.

Contrary to MGP's arguments, disqualifying counsel at this juncture would be seriously and unfairly prejudicial to Ziff Davis. This case been ongoing for two years, including two rounds of motions to dismiss, and appeal to and remand from the Ninth

---

[2] When MGP first raised this issue, Ziff Davis suggested that MGP forego its *ex parte* motion for a stay and, instead, continue discovery (including the depositions). (*See* Dkt. No. 60 at 8:17-22). MGP refused and, therefore, Ziff Davis had to continue preparing for these depositions. (*Id.*).

1   Circuit, and discovery concerning the statute of limitations that may be case
2   dispositive. Further, clients have a strong interest in selecting their counsel of choice.
3   *See In re EXDS, Inc.*, No. C05-0787 PVT, 2005 WL 2043020, at *2 (N.D. Cal. Aug.
4   24, 2005 ("courts start with the proposition that the right of a party to be represented
5   in litigation by the attorney of his or her choice is a significant right and ought not to
6   be abrogated in the absence of some indication the integrity of the judicial process
7   will otherwise be injured"—denying motion to disqualify) (cleaned up). This is
8   particularly true here, where Ziff Davis has not only invested significant time and
9   resources through RIPL as its counsel of record ***in this case*** but as its counsel in
10  dozens of other matters, too. (Ruttenberg Decl. ¶ 4).

11          As detailed in Ziff Davis' opposition to MGP's *ex parte* motion seeking a stay,
12  the instant motion was filed strategically on the eve of, and in order to forestall,
13  depositions. Even when that motion was denied, the witnesses failed to show up and
14  only appeared in order to moot a discovery motion and sanctions. (*See* Dkt. No. 69).

15          The ability of litigants to invoke motions to disqualification ***strategically*** is
16  well documented. *Shurance*, 839 F.2d at 1349. Such motions "are often tactically
17  motivated; they tend to derail the efficient progress of litigation." *In re Marvel*, 251
18  B.R. at 871. The timing and context of MGP's request raises many of these same
19  concerns. Its motion should be denied.

20          **B. MGP Was Never a Prospective Client.**

21          MGP's cannot invoke Rule 1.18 as a basis for disqualification here. MGP
22  unilaterally sent emails and asked for a brief call with an associate, but did not have
23  any reasonable basis for believing that RIPL was willing to represent MGP. Rule
24  1.18(a) defines a "prospective client" as "[a] person who . . . consults a lawyer for the
25  purpose of retaining the lawyer or securing legal service or advice from the lawyer in
26  the lawyer's professional capacity." Further, Rule 1.18(c) applies only if the
27  prospective client disclosed confidential information to an attorney.

28

Comment 2 to Rule 1.18 is instructive here: "A person who by any means communicates information unilaterally to a lawyer, without reasonable expectation that the lawyer is willing to discuss the possibility of forming a lawyer-client relationship or provide legal advice is not a 'prospective client' within the meaning of paragraph (a)." When it sent these emails, MGP had no reasonable expectation for believing that RIPL (much less Ms. Hassid) was willing to consider a representation. Thus, MGP is not a potential client within Rule 1.18.

To support its disqualification motion, MGP relies on (i) three email chains (Exs. A through C to the Greco Declaration, Dkt. No. 76-1) and (ii) Mr. Grecco's description of an April 13, 2018 phone call with Mr. Madanat, who was then an associate with RIPL. During his recent deposition, Mr. Grecco also contended that he had a second ("follow-up") call, where RIPL declined the representation. None of these communications support MGP's present motion.

<u>The Email Chains</u>

Nothing in these emails supports a finding that MGP provided confidential information to RIPL with a reasonable expectation that RIPL would consider a representation.[3] MGP contends it provided confidential information to RIPL through a series of email chains attached as Exhibits A through C to Mr. Grecco's declaration, much of which is non-substantive. Exhibits A and C are mostly identical (except for the last two emails). MGP only contends that the first two emails sent by Ms. Yamada to Ms. Hassid on March 27 and 28, 2018 contain confidential information.

It is undisputed that MGP unilaterally sent the two allegedly confidential emails without any reason to believe that RIPL (or Ms. Hassid) were interested in representing MGP. (Ex. 1 at 165:1-18; *see also id.* at 169:1-4).[4] Mr. Grecco (a

---

[3] Through its counsel, MGP confirmed that it has provided the entirety of its communications with RIPL as Exhibits A through C. (Ex. 1 at 182:19–183:8).

[4] Ms. Yamada knew that Ms. Hassid practices criminal defense law—not anything having to do with copyright law. (Ex. 1 at 160:2-7). It is unclear whether MGP or Ms.

sophisticated litigant) admits he understood that any law firm would need to run a conflicts check. (Ex. 1 at 197:12–21). At the time these emails were sent, RIPL was already representing Ziff Davis on other matters.[5] (Ruttenberg Decl. ¶ 4). MGP had no basis for believing that RIPL was willing to consider a representation when it sent these emails.

Further, no one from RIPL even read the allegedly confidential emails. (Ruttenberg Decl. ¶¶ 11–12; Madanat Decl. ¶ 4). Mr. Ruttenberg was only added to the chain in Exhibit A (and C) on April 10—when he and his wife were in the hospital—and these email chains were not forwarded to Mr. Madanat or anyone else at RIPL. (*See* Dkt. No. 76-1 at Exs. A and C). Neither Mr. Ruttenberg nor anyone else from RIPL responded to any of the email strings that include the allegedly confidential information. Instead, on April 12, Ms. Yamada starts a ***new*** email string (Exhibit B)—which does not include any of the allegedly confidential information— where she acknowledges Mr. Ruttenberg's unavailability and asks to speak with a partner or associate.

It is not even clear that MGP was seeking representation for ***itself***—or even from anyone at RIPL. At least in part, Ms. Yamada's emails appears to be a request for ***referral*** for lawyers who could help her boss's ▮▮▮▮▮▮▮▮ which is presumably a reference to Grecco's Image Defenders and/or Titan Copyright business. (Dkt. No. 76-1 at Ex. C). Ms. Yamada also explained Mr. Grecco wants to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (*Id.*). But Mr. Grecco concedes MGP had no reason to

---

Yamada knew that Ms. Hassid's husband practices in the area of intellectual property. (Compare *id.* at 166:3-7 ("Q. Do you know whether Ms. Yamada was aware that my firm does IP before the response came from this email? A. I'm not aware. I'm not aware either way. I couldn't conclusively say she did or didn't.") *with id.* at 166:13-167:1 ("I think she already knew that before she sent this email. That's why she reached out to your wife.")).

[5] The first email from Ms. Yamada mentions possible litigation targets, but MGP had no way of knowing whether RIPL represented those entities.

believe that RIPL would be involved in such matters. (Ex. 1 at 172:12-20). At his deposition, Mr. Grecco added, "In hindsight, I don't know why she disclosed this much information in an initial email . . . ." (*Id.*).

At bottom, these emails do not support MGP's motion.

<u>Discussions with Attorney Madanat</u>

Likewise, MGP had no basis for believing RIPL was willing to represent MGP based on the April 13, 2018 phone call with associate Bassil Madanat. Again, Mr. Grecco (a sophisticated litigant) concedes he understood lawyers must first clear conflicts before having substantive conversations—and he knew that RIPL had not cleared conflicts before this call. (Ex. 1 at 197:12–21). Based on his typical practice, Mr. Madanat confirms he would have advised MGP that it should not share any confidential information during such a preliminary call. (Madanat Decl. ¶ 6). As noted above, Mr. Madanat did not even receive a copy of the allegedly confidential information in Exhibits A or C. (*See* Dkt. No. 76-1; Madanat Decl. ¶ 4). Indeed, the limited discussion with Mr. Madanat was about seeking representation for ***other photographers*** (not MGP), which RIPL declined. (Madanat Decl. ¶ 7).

Importantly, MGP does not point to any ***specific*** confidential information that was allegedly shared with Mr. Madanat. During his recent deposition, Mr. Grecco characterized the April 13 call with Mr. Madanat as a "preliminary call" (Ex. 1 at 177:4–25), and admitted ***he does not remember the conversation*** with Mr. Madanat:[6]

> Q. Do you have a specific recollection of your conversation with Mr. Madanat on April 13th, 2018?
>
> **A. I don't have a specific recollection of that.**

---

[6] This testimony contrasts starkly with Mr. Grecco's declaration, where he contends that, during this call, he "candidly discussed confidential information concerning MGP's copyright enforcement practices, including confidential information regarding MGP's use of reverse image search technology, and confidential financial information regarding MGP's copyright infringement matter." (Dkt. No. 65-1 ¶ 15). But even in that declaration, Mr. Grecco does not identify any ***specific*** confidential information that was shared.

1 (*Id.* at 197:7–11).

2     Because MGP cannot identify any specific information that was disclosed

3 during that phone call, much less anything that could be characterized as

4 "confidential," its motion should be denied on that basis alone. *See Kuyou Sports*

5 *Goods Co. v. Fountain Inc.*, No. SACV 17-00426 JVS(KESx), 2017 WL 5172239, at

6 *3 (C.D. Cal. June 19, 2017) ("[W]here the former contact with the attorney was a

7 preliminary conversation that did not result in professional employment or services,

8 the party seeking disqualification must show, directly or by reasonable inference, that

9 the attorney acquired confidential information in the conversation."); *Li v. A Perfect*

10 *Day Franchise, Inc.*, No. 11-cv-01189-LHK, 2011 WL 4635176, at *6 (N.D. Cal.

11 Oct. 5, 2011) (denying motion to disqualify counsel because moving party failed to

12 specifically identify the relevant confidential information); *Caldwell v. City of San*

13 *Francisco*, No. 12-cv-01892-DMR, 2021 WL 242867, at *5–6 (N.D. Cal. Jan. 25,

14 2021) (same—"Defendants' vague presentation fails to address the fundamental

15 question: exactly what confidential information did Quadra learn . . . that he could

16 use against Defendants in this case?"); *IPVX Patent Holdings, Inc. v. 8x8, Inc.*, No.

17 4:13-cv-01707 SBA (KAW), 2013 WL 6700303, at *4 (N.D. Cal. Dec. 19, 2013)

18 (same—the moving party "did not identify any specific products in their declarations

19 that were discussed that are directly at issue in this case"); *In re Marriage of*

20 *Zimmerman*, 16 Cal. App. 4th 556, 565 (1993) (affirming denial of motion to

21 disqualify and finding that "conclusory" declaration was insufficient).

22     In any event, Mr. Madanat did not pass along any confidential information, he

23 never worked on this matter, and he is also no longer with RIPL. (Madanat Decl. ¶¶

24 2, 3, 8). MGP's motion should be denied.

25 Second Phone Call

26     Switching theories, at his recent deposition Mr. Grecco contended that he had a

27 ***second*** ("follow-up") phone call—which is not mentioned in his declaration—and

28 that it was actually this second call that led him to believe RIPL was willing to

represent MGP. (Ex. 1 at 174:13–16, 181:13–182:1). He contended (for the first time) that this follow-up call included not only Mr. Madanat but also Mr. Ruttenberg.[7] (*Id.* at 176:13–177:25). When pressed, Mr. Grecco could not specify "when" he spoke with Mr. Ruttenberg. Instead, he insisted, "I have a calendar record. We will be submitting that to the court." (Ex. 1 at 156:3–6). No such "record" has been provided. Mr. Ruttenberg has no recollection of such a call. (Ruttenberg Decl. ¶ 15).

More importantly—according to Mr. Grecco—during this second phone call, RIPL expressly ***declined*** any representation. Per Mr. Grecco's testimony, Mr. Ruttenberg told MGP that he was "too busy to take on anything else right now, that you were about to have a baby or you just had a young baby." (Ex. 1 at 156:14–23). And apart from this second call declining the representation, Mr. Grecco could not point to anything else suggesting counsel was willing to represent MGP:

> Q. Apart from the fact that you say you had a follow-up call where I [Mr. Ruttenberg] was involved, apart from that specific fact, is there anything that I have done that led you to believe that I was willing to represent you or MGP?
>
> A. The second phone call would have been the thing telling me that you were possibly willing to represent us.
>
> Q. And apart form that second phone call, anything else?
>
> A. Obviously not.
>
> Q. All right.
>
> A. We don't have a retainer agreement. So obviously not.

(*Id.* at 181:13–182:1).

\* \* \*

---

[7] Even at his deposition, Mr. Grecco was inconsistent on this point. At first, he insisted he had only one phone call with RIPL and that the phone call included himself, Ms. Yamada, Mr. Madanat and Mr. Ruttenberg. (Ex. 1 at 156:24–157:1). Later in his deposition, Mr. Grecco contended that there were actually two calls. (*Id.* at 174:20–25, 176:13–177:25).

1    In short, RIPL has never expressed any interest in representing MGP, and MGP

2    had no reasonable basis for believing that it would. MGP was not a "potential client"

3    under Rule 1.18 when Ms. Yamada unilaterally sent her initial emails. No one at

4    RIPL read or responded to the emails that supposedly contain confidential

5    information. Mr. Grecco admits he does not actually remember the phone call with

6    Mr. Madanat and cannot identify anything confidential from that discussion. And the

7    only thing Mr. Grecco describes from the supposed "follow-up" call is that RIPL

8    expressly ***declined*** any representation. MGP's motion should be denied.

9    ### C. MGP's Inquiry Is Not Substantially Related to this Case.

10    Even setting aside the issues discussed above, MGP's inquiry had nothing to

11    do with Ziff Davis or the instant litigation. Rule 1.18(c) only applies to

12    "represent[ation of] a client with interests materially adverse to those of a prospective

13    client ***in the same or a substantially related matter***." There is no dispute that MGP's

14    communications with RIPL had nothing to do with Ziff Davis. (Madanat Decl. ¶ 7).

15    The unsolicited email mentions a number of potential targets—none of whom have

16    anything to do with Ziff Davis or this litigation. (Dkt. No. 76-1 at Ex. C). Indeed,

17    according to its Complaint, MGP contends it was not even aware of Ziff Davis or its

18    websites when it reached out in March 2018. (*See* Dkt. No. 26-1 ¶ 22).

19    Undeterred, MGP points to three things from its discussions with RIPL that are

20    supposedly connected to the instant litigation, but none of these arguments pass

21    muster: (i) the use of reverse image searching; (ii) MGP's relationship with

22    ImageRights; and (iii) financial information related to MGP's valuation of its

23    copyright litigation claims. MGP never explains how any of the information it

24    disclosed concerning these issues relates to Ziff Davis or the instant litigation.

25    For example, MGP's use of reverse image searching is disclosed expressly in

26    the Complaint. (Dkt. No. 26-1 ¶ 21). Its relationship with ImageRights has been the

27    subject of interviews and extensive public disclosures. (*See* Dkt. No. 60 at 8 n.3).

28    MGP did not supply anything confidential or specific that could be used in

connection with the instant litigation. And the only financial information (which MGP unilaterally provided in its first email) is so broad and generic that it would be entirely useless even if RIPL had read it at the time. MGP makes no effort to explain how the information disclosed to RIPL could be used against MGP in this litigation.

To be clear—and to the extent MGP argues otherwise—RIPL has never used (and had no ability or reason to use) any information disclosed by MGP in 2018. No one from RIPL read the emails that MGP contends are confidential. (Ruttenberg Decl. ¶¶ 11–12; Madanat Decl. ¶ 4). The discovery pursued by Ziff Davis is based upon publicly available information, including information available from other cases filed by MGP and interviews given by Mr. Grecco.

Although Ziff Davis is unaware of any cases interpreting "substantially related" with respect to Rule 1.18, courts interpreting that phrase in connection with other Rules have required an analysis of "(1) the relationship between the legal problem involved in the former representation and the legal problem involved in the current representation, and (2) the relationship between the attorney and the former client with respect to the legal problem involved in the former representation." *Fremont Indemnity Co. v. Fremont General Corp.*, 143 Cal. App. 4th 50, 67 (2006). Here, there is no relationship between the "legal problems" in the two matters because there ***were no*** legal problems discussed in 2018. With respect to the second factor, "even if the issues are similar, there must be some basis to conclude that an attorney who had no direct, personal involvement in the prior representation was privy to confidential information." *Id.* at 68. Of course, there was no prior representation in this case, but rather an email and a brief conversation about representing other photographers. Counsel in this case (Guy Ruttenberg) "had no direct personal involvement" in the 2018 communications—except (according to Mr. Grecco's deposition testimony) a follow-up call declining the representation. As noted above, Mr. Ruttenberg was unavailable to discuss the matter. The only RIPL

OPPOSITION TO MOTION TO DISQUALIFY

1    attorney who did speak with MGP—Mr. Madanat—has never worked on this case

2    (and has been screened from it).

3         The facts here are afield from the facts in the cases MGP relies upon. For

4    example, MGP relies *Export-Import Bank of Korea v. ASI Corp.*, No.

5    CV162056MWFJPRX, 2019 WL 8200603 (C.D. Cal. Jan. 16, 2019), which

6    distinguishes other cases by emphasizing that the attorney was involved in

7    "substantial communications, review of numerous confidential documents,

8    formulation of legal strategies and phases of potential representation, etc." *Id.* at *8.

9    MGP does not cite any case that is remotely analogous to the circumstances here.

10        **D. The Information MGP Disclosed to RIPL Is Not Confidential at All.**

11        Notably, little if any of the information disclosed by MGP (even in the unread

12   emails) qualifies as "confidential." In his declaration, Mr. Grecco claims that "Ms.

13   Yamada's email contained confidential information concerning MGP's copyright

14   enforcement strategy, including information with respect to its use of reverse image

15   search technologies such as ImageRights, and confidential financial information

16   related to MGP's valuation of copyright litigation claims." (Dkt. No. 65-1 ¶ 5). But

17   MGP sent that information without any assurances of confidentiality. In fact, the

18   original email from Ms. Yamada identifies potential litigation targets, whereas MGP

19   had no way of knowing whether those targets were existing clients of RIPL. Indeed,

20   all of this information (including the emails themselves) have been provided in the

21   instant litigation without any Protective Order in place.

22        Comparing the general information in the correspondence with public

23   information belies any assertion of confidentiality. As explained, the generalized

24   notions that MGP uses reverse image searching, the existence of its relationship with

25   ImageRights, its partnership with particular law firms, information about its finances,

26   and MGP's status as a copyright assertion entity are all public information. Courts

27   have found that information that ***later*** becomes public may not be considered

28   "confidential" under the Professional Rules of Conduct. *See Kuyou*, No. SACV 17-

OPPOSITION TO MOTION TO DISQUALIFY

00426 JVS(KESx), 2017 WL 5172239, at *3 (finding information that was publicly disclosed was not confidential); *Faraday&Future, Inc. v. EVelozcity, Inc.*, No. CV 18-737-DMG (RAOx), 2018 WL 4849704, at *8 (C.D. Cal. May 30, 2018) (information not confidential when it was later publicly disclosed). MGP's information here goes beyond that because it was not even confidential at the time.

For example, it is public information that MGP uses ImageRights to detect instances of alleged copyright infringements and stores them in a "portal." (Dkt. No. 60-2 at 41–43) (Grecco explaining that "Image Rights . . . is one of the services I have used," that he "actually started my own service at this point . . . because I do it better than everyone else," that his new company has "partnered" with a law firm having "its own software and portal, and they go to three third-party search engines," and his new firm (Higbee) "has gone into my Image Rights portal and actually downloaded all the sightings."); https://pdnonline.com/photography-business/copyright-law/how-and-why-to-make-copyright-registration-part-of-your-workflow/ (October 2015 article: Grecco "uses a service, imagerights.com, to troll the Internet for unauthorized uses of his images")). *See also Michael Grecco Prods, Inc. v. BDG Media Inc.*, No. CV 19-04716-AB, 2020 WL 3957565, at *2 (C.D. Cal. Feb. 26, 2020) ("[Grecco] has, in the past, utilized a third-party reverse image search software platform operated by ImageRights")).

It is also public information that Mr. Grecco teams up with law firms to assert copyright claims, who have access to the ImageRights detections. (*See* https://labusinessjournal.com/news/2016/oct/21/photographers-focused-online (October 2016 article: "Grecco said he is slogging through 35,000 possible instances of copyright infringement and he works with a team of eight law firms."); Dkt. No. 60-2 at 42–43 (Grecco stating that he "ha[s] eight firms that I use" and that he has "partnered with, because I have such a high volume of sightings," and that one of his firms, Higbee (MGP's counsel of record in this case) "has their own portal [to access MGP's images], and they have 20 case workers" that manage MGP's copyright

assertions and "they also have their own three search engines" to look for allegedly infringing works); https://titancopyright.com/about/ (Grecco's company touting partnership with attorneys at Hertz, Lichtenstein, Young and Polk, LLP)). *See also Golden v. Michael Grecco Prods, Inc.*, No. 19CV3156NGGRER, 2021 WL 878587, at *7 (E.D.N.Y. Mar. 9, 2021) ("[T]his team's conduct has led another court to suggest that Grecco's counsel might be considered a 'copyright troll,'" a term that refers to someone who scours the internet for unlicensed use of copyrighted material for the purpose of extracting settlements.")). Grecco's relationships with the particular law firms identified in Ms. Yamada's email (in addition to Higbee) are also public. *Michael Grecco Prods., Inc. v. Alamy Inc.*, No. 18-CV-3260 (PKC) (JO), 2020 WL 5848613 (E.D.N.Y. Oct. 1, 2020) (Duane Morris LLP); https://labusinessjournal.com/news/2016/oct/21/photographers-focused-online/ (Doniger); *Michael Grecco Prods., Inc. v. Enthusiast Gaming, Inc.*, No. 19-cv-06399-LHK (N.D. Cal. Dec. 8, 2020) (Perkowski); *Michael Grecco Prods., Inc. v. Valuewalk, LLC*, 345 F. Supp. 3d 482 (S.D.N.Y. 2018) (Spector Gadon & Rosen); *Grecco v. Associated Press*, No. 16-cv-6240 (VEC), 2017 WL 2913501 (S.D.N.Y. July 7, 2017) (Nelson & McCulloch LLP); *Michael Grecco Prods., Inc. v. UMG Recordings, Inc.*, No. 1:17-cv-01384-JGK, Dkt. No. 1 at 11 (S.D.N.Y. Feb. 23, 2017) (Intellectual Property Group); *Michael Grecco Prods, Inc. v. Wenn Ltd.*, No. 1:17-cv-01843-KBF, Dkt. No. 1 at 20 (S.D.N.Y. Mar. 13, 2017) (Meloni & McCaffrey).

The fact that Grecco uses software to locate allegedly infringing works and partners with ImageRights to do so is also publicly known. (https://titancopyright.com/how-it-works/ (Grecco's website touting that "Utilizing proprietary search technology, we scour billions of websites to identify uses of your images."); Dkt. No. 60-2 at 41 (explaining that he uses ImageRights' software to detect alleged infringements), 42 (his partner law firms have their own software). Indeed, it is not confidential information that locating a picture on the internet must

OPPOSITION TO MOTION TO DISQUALIFY

use some unspecified type of software. (*See* Dkt. No. 26-1 ¶ 21 (MGP found the alleged infringement using software)).

It is also public knowledge that Grecco has partnered with other well-known photographers in enforcing copyrights against alleged infringers (https://titancopyright.com/about/ (listing Elizabeth Waterman, "a portrait and fine art photographer")) and that he was involved in publicly-filed litigations with the entities listed.

Moreover, the fact that MGP ██████████████████████████████ ████████████████████ cannot seriously be characterized as confidential information, and MGP cites no authority suggesting otherwise. And while financial information may sometimes be confidential, the information Ms. Yamada disclosed had either already been disclosed by MGP or is too general to be protected. Mr. Grecco has, for example, been extraordinarily candid regarding his and his company's finances. He has disclosed the breakdown of revenue obtained from copyright enforcement efforts between the copyright holder, attorneys, and his company and has been open about how much money he gets from his enforcement efforts. (Dkt. No. 60-2 at 41 (discussing his company's split of revenue from enforcement (copyright holder takes 50%, company 20%, attorney 30%)); *see also id.* at 42 (stating that he is "negotiating fees that are 5 and 10 times higher than everyone else"), 12 (Mr. Grecco requires $750 a day and $750 a page and boasting that it was not until recently that magazines figured out about a 90-day embargo period as a business model); https://pdnonline.com/photography-business/copyright-law/how-and-why-to-make-copyright-registration-part-of-your-workflow/ ("My collections for infringement far surpass revenues I was getting ten years ago for my syndication and creative stock, when that market was a viable market."); Dkt. No. 60-3 (internal emails from July 2016 regarding settlement negotiations: "In a negotiation I do not go from 5,370 Euro all the way down to 3,000 that quickly. . . . [W]e just licensed the

1  use of one editorial image on the web for $13,500 to the Financial Times of London. .
2  . . . Based on that, I would go down to 5,000 Euros to start.")).

3      MGP cites two cases for the proposition that confidential information does not
4  lose its protected status if is publicly available. Both are distinguishable. For
5  example, in *SkyBell Techs., Inc. v. Ring, Inc.*, No. SACV1800014JVSJDEX, 2018
6  WL 6016156, at *6 (C.D. Cal. Sept. 18, 2018), the court found it significant that the
7  information remained confidential "at the time the information was divulged."
8  Similarly, in *In re Johnson*, No. 96-O-05705, 2000 WL 1682427, at *10 (Cal. Bar Ct.
9  Oct. 26, 2000), the State Bar Review Department concluded that the information
10  disclosed was not easily discoverable. The facts contrast starkly with the abundant
11  public information that is widely available here.

12      In short, MGP is a sophisticated litigant. It unilaterally disclosed information in
13  an email without any assurance or expectation of confidentiality—and without
14  knowing whether RIPL was already adverse to MGP. Indeed, Ziff Davis was already
15  a long-standing client of RIPL in March 2018. Even now, MGP has not sought a
16  Protective Order to require any confidential treatment for any of this information.
17  MGP cannot seriously contend that the information should be treated as
18  "confidential."

19  ## VI.   <u>CONCLUSION</u>

20      The Court should deny MGP's motion to disqualify. MGP was not a potential
21  client, and the information it disclosed to RIPL was not confidential and not material
22  to this case.

23

24   DATED:  July 26, 2021      By:      */s/ Guy Ruttenberg*

25

26

27

28

OPPOSITION TO MOTION TO DISQUALIFY

Guy Ruttenberg
Michael Eshaghian
RUTTENBERG IP LAW, A
PROFESSIONAL CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, CA 90067
Telephone: (310) 627-2270
Facsimile: (310) 627-2260
guy@ruttenbergiplaw.com
mike@ruttenbergiplaw.com

*Attorneys for Defendant Ziff Davis, LLC*