Guy Ruttenberg, Bar No. 207937
guy@ruttenbergiplaw.com
Michael Eshaghian, Bar No. 300869
mike@ruttenbergiplaw.com
RUTTENBERG IP LAW,
A PROFESSIONAL CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, CA 90067
Telephone: (310) 627-2270
Facsimile: (310) 627-2260

*Attorneys for Defendant Ziff Davis, LLC*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL GRECCO PRODUCTIONS, INC. d/b/a MICHAEL GRECCO PHOTOGRAPHY, INC.,<br><br>       Plaintiff,<br><br>   v.<br><br>ZIFF DAVIS, LLC; and DOES 1 through 10 inclusive,<br><br>       Defendants. | Case No. 2:19-cv-04776-DSF-JC<br><br>**[REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL]**<br><br>**EXHIBIT 1 TO THE DECLARATION OF GUY RUTTENBERG IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY**<br><br>Judge:    Hon. Dale S. Fischer |

EXHIBIT 1

# Exhibit 1

1                ROUGH DRAFT OF PROCEEDINGS

2                TUESDAY, JULY 13, 2021

3                    MICHAEL GRECCO

4    THE FOLLOWING IS A ROUGH, UNEDITED TRANSCRIPT.

5    BY RECEIVING THIS UNOFFICIAL DRAFT TRANSCRIPT, YOU
     ARE AGREEING TO PURCHASE THE CERTIFIED TRANSCRIPT OF
6    THIS MATTER WHEN IT IS PREPARED BY THE COURT
     REPORTER.
7
     THIS UNOFFICIAL DRAFT TRANSCRIPT IS PROVIDED TO YOU
8    SOLELY AS A LITIGATION SUPPORT TOOL FOR USE IN-HOUSE
     BY YOU, OTHER MEMBERS OF YOUR STAFF, ASSOCIATE
9    COUNSEL, PARALEGALS, OR EXPERT CONSULTANTS.

10   THIS UNOFFICIAL TRANSCRIPT IS PROVIDED TO YOU WITH
     THE EXPLICIT UNDERSTANDING THAT YOU WILL IN NO WAY
11   MAKE IT AVAILABLE, IN WHOLE OR IN PART, IN ANY FORM,
     TO ANYONE ELSE.
12
     THIS TRANSCRIPTION HAS BEEN NEITHER CHECKED NOR
13   PROOFREAD.  IT IS A ROUGH DRAFT, NOT A CERTIFIED
     TRANSCRIPT.  THE UNOFFICIAL DRAFT TRANSCRIPT MAY
14   CONTAIN COMPUTER-GENERATED MISTRANSLATIONS OF
     STENOTYPE CODE RESULTING IN NONSENSICAL WORD
15   COMBINATIONS OR UNTRANSLATED SYMBOLS WHICH CANNOT BE
     DECIPHERED BY NON-STENOTYPISTS.  CORRECTIONS WILL BE
16   MADE IN THE PREPARATION OF THE CERTIFIED TRANSCRIPT
     RESULTING IN DIFFERENCES IN PAGE AND LINE NUMBERS,
17   PUNCTUATION, AND FORMATTING.

18

19

20

21

22

23

24

25

                                                         1

10:27  1          THE WITNESS:  No.

10:27  2    BY MR. RUTTENBERG:

10:27  3          Q.   Okay.  Before we get too far, let's just

10:27  4    make sure we understand who is who, if that's okay.

10:27  5               There is a plaintiff, obviously, in this

10:27  6    case called Michael Grecco Productions, Inc.

10:27  7               Is that' a company you are familiar with?

10:27  8          A.   It is.

10:27  9          Q.   What is your title with Michael Grecco

10:27  10   Productions, Inc.?

10:27  11         A.   President and CEO.

10:27  12         Q.   Are there other employees of Michael

10:27  13   Grecco Productions, Inc.?

10:27  14         A.   There are employees of Michael Grecco

10:27  15   Productions, Inc.

10:27  16         Q.   Approximately how many employees?

10:27  17         A.   Three.

10:28  18         Q.   Can you name them?

10:28  19         A.   Yes.

10:28  20         Q.   Please do so.

10:28  21         A.   Torina Yamada.

10:28  22         Q.   Okay.

10:28  23         A.   Michael M-Y-K-L-E or her legal name is

10:28  24   Michelle Parker.  You can put the "Mykel" in quotes.

10:28  25               Denise Wallace.  And we have an occasional

17

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

10:28   1   retoucher named Chiara, C-H-I-A-R-A, Chiara; Merico,

10:28   2   M-E-R-I-C-O.

10:28   3        Q.   That's okay.  A Ms. Merico?

10:28   4        A.   Correct.

10:28   5        Q.   Ms. Merico is retoucher, meaning she

10:28   6   retouches the paragraphs; is that right?

10:28   7        A.   Correct.

10:28   8        Q.   And Ms. Parker is your archivist; is that

10:28   9   correct?

10:28   10       A.   That's correct.

10:28   11       Q.   What does Denise Wallace do?

10:29   12       A.   She is our intern, errand runner,

10:29   13   assistant.

10:29   14       Q.   Has she been with you for a while or is

10:29   15   she --

10:29   16       A.   A year.

10:29   17       Q.   And then Torina Yamada, how long has she

10:29   18   been with you?

10:29   19       A.   Four or five years.

10:29   20       Q.   What is her primary responsibility?

10:29   21       A.   She is my admin/studio manager.

10:29   22       Q.   Other than the three individuals plus

10:29   23   Ms. Merico, does Michael Grecco Productions, Inc.

10:29   24   have any other employees?

10:29   25       A.   No.  And only two of them are treated

18

** ROUGH TRANSCRIPT **

10:36  1   the Titan Copyright?

10:36  2        A.   Elizabeth Grecco Waterman.

10:36  3        Q.   Is that a relative of yours?

10:36  4        A.   Yes.

10:36  5        Q.   Who is Elizabeth Waterman Grecco

10:36  6   [verbatim]?

10:36  7        A.   My wife.

10:36  8        Q.   I'm sorry.  I think I said, "Elizabeth

10:36  9   Waterman Grecco" actually, but it's "Elizabeth

10:36 10   Grecco Waterman"?

10:36 11        A.   Correct.

10:36 12        Q.   Does Mr. Heber [phonetic], Heber

10:36 13   Associates, own any part of Image Defenders or Titan

10:36 14   Copyright, today or in the past?

10:36 15             MR. RUTTENBERG:  Objection.  To form.

10:36 16             THE WITNESS:  You need to restate that

10:36 17   question, Counselor.

10:36 18   BY MR. RUTTENBERG:

10:36 19        Q.   First of all, is Titan Copyright the same

10:36 20   as what used to be known as Image Defenders?

10:36 21        A.   No.

10:36 22        Q.   Those are two different companies?

10:36 23        A.   Correct.

10:36 24        Q.   Can you -- can you explain the difference?

10:36 25        A.   They are different partners.

                                                          25

10:36  1        Q.   Can you --

10:36  2        A.   Different partners.  There are different

10:36  3   ownerships.  They're separate companies.

10:37  4        Q.   What is the company name of the

10:37  5   imagedefenders.com?  Is "Image Defenders" the name

10:37  6   of the company?

10:37  7        A.   It is.

10:37  8        Q.   What is the full, legal name if you know

10:37  9   it?

10:37  10       A.   I believe it's Image Defenders LLC, a

10:37  11  Nevada corporation.

10:37  12       Q.   It's incorporated in Nevada?

10:37  13            MR. CARREON:  That would be the Nevada

10:37  14  corporation; that is correct.

10:37  15            MR. RUTTENBERG:  The reason I am confused

10:37  16  is because he said "Image Defenders LLC, a Nevada

10:37  17  corporation."  Is it an LLC or is it a corporation.

10:37  18            MR. CARREON:  A Nevada LLC.

10:37  19  BY MR. RUTTENBERG:

10:37  20       Q.   Thank you.  Who owns Image Defenders LLC?

10:37  21       A.   I'm not sure if it's officially been

10:37  22  dissolved but it's on its way to being dissolved.

10:37  23  So it would be Matt Higbee, that's a 50 percent

10:37  24  owner.  And my wife and I are the other 50 percent.

10:38  25       Q.   Did Image Defenders LLC at some point

26

10:38   1   transfer its business in some way -- in some way,

10:38   2   shape or form to Titan Copyright?

10:38   3            MR. CARREON:  Object to form.

10:38   4            THE WITNESS:  We parted ways with the

10:38   5   other partner.

10:38   6   BY MR. RUTTENBERG:

10:38   7       Q.   With -- you -- you parted ways with Matt

10:38   8   Higbee?

10:38   9       A.   That is correct.  In -- as far as Image

10:38   10  Defenders is concerned.

10:38   11      Q.   Why did that happen?

10:38   12      A.   It worked out best for our clients.

10:38   13      Q.   If you did not have a partnership with

10:38   14  Mr. Higbee?

10:38   15      A.   That's correct.

10:38   16      Q.   Is that because Mr. Higbee's firm

10:38   17  represents you in litigation?

10:38   18      A.   No.

10:38   19      Q.   Unrelated?

10:38   20      A.   Unrelated.

10:38   21      Q.   Can you explain what you mean by "it

10:38   22  worked out best" for your clients?

10:38   23      A.   We found that there was a level of

10:38   24  conflict to have one of the law firms representing

10:39   25  our clients also the owner of the business.

27

10:39   1        Q.   Does -- the Hertz Lichenstein -- Hertz

10:39   2   Lichenstein firm represent you in litigation as

10:39   3   well?

10:39   4        A.   No.   They are transactional attorneys.

10:39   5   Entertainment attorneys, transactional attorneys,

10:39   6   and they don't litigate.

10:39   7        Q.   Does Mr. Higbee, as far as you know, have

10:39   8   any relationship with the Hertz Lichenstein lawyers?

10:39   9            MR. CARREON:   I just a want to caution

10:39  10   you, Michael.   If there is any discussions that you

10:39  11   have had with Matt Higbee, in the guise of seeking

10:39  12   legal advice or any of your cases, that that would

10:39  13   be privileged and I would instruct you not to

10:39  14   answer; if the answer requires you to divulge any of

10:39  15   those types of conversations.

10:39  16            THE WITNESS:   Got it.

10:39  17   BY MR. RUTTENBERG:

10:39  18        Q.   And to be clear, I think Mr. Carreon

10:39  19   agrees that the facts are not privileged and I'm not

10:39  20   asking you to disclose any communications.   Just the

10:40  21   facts that you are aware of for?

10:40  22            MR. CARREON:   Yeah, I agree with that.   I

10:40  23   am just cautioning him that there might be some

10:40  24   privilege linkage.

10:40  25            MR. RUTTENBERG:   Gotcha.

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

10:40  1           THE WITNESS:  Restate your privilege,

10:40  2  please.

10:40  3  BY MR. RUTTENBERG:

10:40  4      Q.   Does Mr. -- and I'm sorry if I botched it.

10:40  5  I'm not familiar with the Hertz?

10:40  6      A.   Ken Hertz.  Ken Hertz.

10:40  7      Q.   It's Hertz Lichenstein?

10:40  8      A.   Hertz Lichenstein.

10:40  9      Q.   Hertz Lichenstein?

10:40  10     A.   Ken Hertz is our -- is our partner

10:40  11  essentially.  He holds -- he holds the partnership

10:40  12  through his law firm.

10:40  13     Q.   Does Mr. Higbee have any relationship with

10:40  14  the Hertz Lichenstein firm as far as you are aware

10:40  15  of?

10:40  16     A.   No.

10:40  17     Q.   Was there a sale of assets from Image

10:40  18  Defenders to Titan Copyright?

10:40  19     A.   No.

10:40  20     Q.   Are you aware that if you try to go to

10:40  21  imagedefenders.com it resolves to Titan Copyright?

10:40  22     A.   Yes.

10:40  23     Q.   How did that come to be?

10:40  24     A.   I own the URLs.

10:40  25     Q.   So you personally own the URL of

** ROUGH TRANSCRIPT **

10:40   1    imagedefenders.com so you can direct it to Titan

10:40   2    Copyright?

10:40   3         A.   Correct.

10:40   4         Q.   What was the purpose of Image Defenders?

10:41   5         A.   The similar purpose as to Titan Copyright.

10:41   6         Q.   But at some point, you switched the

10:41   7    business of assisting other photographers to enforce

10:41   8    their copyrights from Image Defenders to Titan

10:41   9    Copyright?

10:41   10             MR. CARREON:  Object to the form.

10:41   11   BY MR. RUTTENBERG:

10:41   12        Q.   Is that generally correct?

10:41   13             MR. CARREON:  My apologies.

10:41   14             MR. RUTTENBERG:  That's okay.  I wasn't

10:41   15   trying to say anything controversial.  So let me

10:41   16   withdraw.

10:41   17   BY MR. RUTTENBERG:

10:41   18        Q.   Is it correct that the purpose of Image

10:41   19   Defenders was to assist businesses -- withdrawn.

10:41   20             Is it correct that the business of Image

10:41   21   Defenders was to assist other photographers in

10:41   22   enforcing their copyrights?

10:41   23        A.   Yes.

10:41   24        Q.   Is it correct that the business of Titan

10:41   25   Copyright is to assist photographers in enforcing

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

10:41    1    their copyrights?

10:41    2         A.   Yes.

10:41    3         Q.   Is it correct that at some point, you

10:41    4    shifted the business for assisting photographers and

10:41    5    enforcing their copyrights from Image Defenders to

10:41    6    Titan Copyright?

10:41    7         A.   No.

10:41    8         Q.   You -- you didn't shift that?

10:42    9         A.   What does "shift" mean?

10:42   10         Q.   All right.  Well, were there existing

10:42   11    clients or relationships that you had --

10:42   12         A.   Okay.

10:42   13         Q.   -- at --

10:42   14         A.   Yes.  There were.

10:42   15              (Simultaneously speaking.)

10:42   16              THE REPORTER:  And one at a time.

10:42   17    BY MR. RUTTENBERG:

10:42   18         Q.   Were there existing clients you had at

10:42   19    Image Defenders?

10:42   20         A.   Yes.

10:42   21         Q.   Were those existing clients transferred to

10:42   22    Image Defenders -- withdrawn.

10:42   23              Were there existing clients at Image

10:42   24    Defenders that you transferred to Titan Copyright?

10:42   25         A.   We didn't transfer any.  There were

31

** ROUGH TRANSCRIPT **

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

03:40 1    spoken before?

03:40 2         A.   Yes.

03:40 3         Q.   Do you know when you and I have spoken

03:40 4    before?

03:40 5         A.   No.  I have the calendar record.  We will

03:40 6    be submitting that to the court.

03:40 7         Q.   You have a calendar -- a calendar record

03:40 8    of you and I speaking?

03:40 9         A.   Yes.

03:40 10        Q.   Who was on the call when you and I spoke?

03:40 11        A.   Torina and Bassil.  Bassil.

03:40 12        Q.   How many times have you and I spoken?

03:40 13        A.   Just once before.

03:40 14        Q.   And how many times have you and Ms. Bassil

03:40 15   spoken before?  Or Bassil?

03:40 16        A.   Bassil.  There was an email exchange to

03:40 17   set up a call.  We all agreed to set up a call, and

03:40 18   we had a call with you.  And you told us you were

03:40 19   having -- this was when you were having your three

03:41 20   and a half year old, and you told us that you were

03:41 21   too busy to take on anything else right now, that

03:41 22   you were about to have a  baby or you just had a

03:41 23   young baby.

03:41 24        Q.   So how many times did you have a call with

03:41 25   Bassil ?  Let me start there.  Was it just one call?

156

** ROUGH TRANSCRIPT **

03:41   1      A.    It was one call with the four of us.

03:41   2      Q.    So your testimony is that there was a call

03:41   3   between yourself, Torina, Bassil, and me?

03:41   4      A.    That's correct.

03:41   5      Q.    How long did that call last?

03:41   6      A.    20 minutes or so.  15 minutes.

03:41   7      Q.    And when was the first time that you --

03:41   8   that you remember that I had spoken to you?

03:41   9      A.    Torina brought it up in a conversation

03:41   10  about her deposition.

03:41   11     Q.    What did she say?

03:41   12     A.    I can't go into the details because it's

03:41   13  attorney-client privilege.

03:41   14     Q.    So there was a lawyer there?

03:41   15     A.    Yes.

03:41   16     Q.    So at some point, you and Terina and a

03:41   17  lawyer had a meeting and Torina said "We have spoken

03:41   18  to Guy before"?

03:41   19     A.    Correct.

03:42   20     Q.    You, yourself, have been involved in

03:42   21  monitoring this litigation from the beginning; is

03:42   22  that right?

03:42   23     A.    That's true.

03:42   24     Q.    And you have received copies of pleadings

03:42   25  that we have filed?

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

03:44   1   recommend.

03:44   2        Q.   Do you know whether Ms. Yamada knew

03:44   3   that -- well, withdrawn.  Do you know what kind of

03:44   4   work my wife does?

03:44   5        A.   She is a criminal litigator,  I believe.

03:44   6        Q.   You understand that my wife does not

03:44   7   practice?  IP litigation or anything else?

03:44   8        A.   Yeah.  But we didn't speak to your wife,

03:44   9   we spoke to you.

03:44   10       Q.   One question at a time?

03:44   11       A.   Okay.

03:44   12       Q.   You understand that my wife has never

03:44   13   practiced anything relating to IP litigation; is

03:44   14   that correct?

03:44   15       A.   I do.

03:44   16       Q.   I'm sorry, sir.

03:44   17       A.   I'm -- I'm not done with my answer.

03:44   18       Q.   But you --

03:44   19       A.   I said "I do."  And I said "But we didn't

03:44   20   speak to your wife."

03:44   21       Q.   Sir, you understand my wife has never

03:44   22   practiced anything relating to IP litigation; is

03:44   23   that correct?

03:44   24       A.   Yes.  But we didn't speak to your wife.  I

03:45   25   get to answer-t a complete answer.

** ROUGH TRANSCRIPT **

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

03:59   1      Q.    Okay.   In terms of Ms. Yamada reaching out

03:59   2   to my wife about anything having to do with Grecco,

03:59   3   MGP, or yourself, as far as you know, this email on

03:59   4   March 27th, 2018, at 3:20 p.m., that's the first

03:59   5   communication.   Is that fair?

03:59   6      A.    Yes.

04:00   7      Q.    Now, it says, [as read]:

04:00   8     ██████████████████████

04:00   9     ██████████████████████

04:00   10    ███████████████████████████

04:00   11    ███████████████████████████

04:00   12       And I take it her boss is referring to

04:00   13   to you; is that right?

04:00   14      A.    That is correct.

04:00   15      Q.    Before Ms. Yamada sent this first email on

04:00   16   March 27th, 2018, do you know whether my wife

04:00   17   invited her to send this email?

04:00   18      A.    No.   I have no clue.

04:00   19      Q.    Do you know whether -- well, withdrawn.

04:00   20       The first response from my wife, says [as

      21   read]:

      22       "Guy does some IP work, he's going

      23       to ask around and see if anybody -- see

      24       if he knows anybody who can help out

      25       with this."

** ROUGH TRANSCRIPT **

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

04:00  1              Do you see that?

04:00  2       A.   Yes.

04:00  3       Q.   Do you know whether Ms. Yamada was aware

04:00  4  that my firm does IP before the response came from

04:01  5  this email?

04:01  6       A.   I'm not aware.  I'm not aware either way.

04:01  7  I couldn't conclusively say she did or didn't.

04:01  8       Q.   You never asked her that?

04:01  9       A.   Correct.

04:01  10      Q.   Did you authorize Ms. Yamada to send this

04:01  11 email to my wife?

04:01  12      A.   Yes.

04:01  13      Q.   What did she ask you to do?

04:01  14      A.   She says "I believe a husband of a friend

04:01  15 of mine does IP work.  Can I reach out to him."

04:01  16           I said "sure.  Set up a call."

04:01  17      Q.   I'm sorry.  A minute ago you told me she

04:01  18 didn't whether or not she knew that I knew IP worked

04:01  19 for the response.

04:01  20           So I'm talking about the very first email.

04:01  21 You authorized Ms. Yamada to send that first email?

04:01  22      A.   Yes.  So I -- yes.  The way this is worded

04:01  23 is she is asking, in general, if you know someone.

04:01  24           I think she already knew that before she

04:01  25 sent this email.  That's why she reached out to your

                                                          166

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

04:01   1   wife.

04:01   2        Q.   And what is your basis for saying that she

04:01   3   already knew that?

04:01   4        A.   Because she wouldn't have sent this email

04:01   5   without me approving it.

04:01   6        Q.   So --

04:01   7        A.   We -- we had -- she -- you know, we have

04:02   8   dozens of conversations every day.   But she -- I

04:02   9   believe she asked if it was okay to send this.

04:02   10        Q.   How would she ask you that?  Verbally or

04:02   11   in writing?

04:02   12        A.   Verbally.   We intercom each other about

04:02   13   20, 30 times a day back and forth.

04:02   14        Q.   Do you know whether she would ask for your

04:02   15   permission to send something that was a referral

04:02   16   reply?

04:02   17        A.   Yes, of course, she would.

04:02   18        Q.   Did approve the Ms. Yamada sending this

04:02   19   email before she sent it?

04:02   20        A.   I didn't approve the context -- the

04:02   21   content of the email.  But I approved her reaching

04:02   22   out.

04:02   23        Q.   Did you see the content of the email

04:02   24   before it went out to my wife?

04:02   25        A.   I just answered that.  I said no.

                                                    167
** ROUGH TRANSCRIPT **

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

04:03  1        Q.   Do you have any reason to believe that my

04:03  2   wife told Ms. Yamada to send her confidential

04:03  3   information?

04:03  4        A.   No.

04:03  5        Q.   Then if you go on and say -- withdrawn.

04:04  6             Do you know whether the fact that you ███

04:04  7   ████████████████, is that confidential?

04:04  8        A.   We don't usually discuss the fee

04:04  9   arrangements with our attorneys because we -- in a

04:04  10  copyright litigation, we are asking for our legal

04:04  11  fees.  So it's something that we would not make

04:04  12  public and do not disclose.

04:04  13       Q.   The fact that it's -- it's ███████, is

04:04  14  that something you don't normally disclose?

04:04  15       A.   I just said that.

04:04  16       Q.   You said fee arrangement.  There is -- I?

04:04  17  Am being more general in that department.  But the

04:04  18  facts is, in general, is that confidential?

04:04  19       A.   Obviously, if we don't discuss the fee

04:04  20  arrangement; right?

04:04  21       Q.   So Images Defenders -- withdrawn.

04:04  22            Titan copyright has a website; right?

04:04  23       A.   Yes.

04:04  24       Q.   And you are aware that Titan Copyright

04:04  25  talks about the fee arrangements being a contingency

                                                              169

** ROUGH TRANSCRIPT **

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

04:06  1   referring to Image Defenders as well?

04:06  2        A.   I -- I think it was referring to both.  It

04:07  3   would first be referring to MGP.

04:07  4        Q.   When you say that, what is your basis for

04:07  5   saying that?

04:07  6        A.   Because we vet everyone we use first.  I

04:07  7   vet them and know if they can perform before I'm

04:07  8   going to let them handle one of our client's cases.

04:07  9        Q.   You say clients.  When you say client, do

04:07  10  you mean client's of Image Defenders?

04:07  11       A.   Correct.

04:07  12       Q.   Ms. Yamada said he wants to [as read]:

04:07  13  ███████████████████████████████████

04:07  14  ████████████████████████████████████

04:07  15  ███████████████████████████████

04:07  16  ██████████████

04:07  17            Did you have any reason to believe or did

04:07  18  Ms. Yamada have any reason to believe that my firm

04:07  19  is involved in going after ███████████████████

04:07  20  ████████████████?

04:07  21       A.   No.  In hindsight, I don't know why she

04:07  22  disclosed this much information in an initial email

04:07  23  to your wife.

04:08  24       Q.   Do you know whether Ms. Yamada was seeking

04:08  25  counsel or seeking a referral for counsel?

                                                        172
** ROUGH TRANSCRIPT **

04:09  1        A.    Yeah.  But that wasn't the question you

04:09  2   asked me.  You asked me if we were seeking a lawyer

04:09  3   or a seeking a referral and that's the same thing.

04:09  4   We were seeking a lawyer and obviously we are

04:09  5   seeking a referral to a lawyer.

04:09  6            So she knew that your wife did not do IP

04:09  7   law.  As I answered before, I believe she asked your

04:09  8   wife because she knew you did.

04:09  9        Q.    She said "Guy does some IP work.  He is

04:09  10  going to ask around and see if he knows anybody."

04:09  11           Do you see that?

04:09  12       A.    I do.

04:09  13       Q.    Do you know if Ms. Yamada was inquiring

04:09  14  whether we might know somebody who might help you as

04:09  15  opposed to whether we actually could help you

04:09  16  ourselves.

04:09  17           Do you know whether that is what she is

04:09  18  asking for?

04:09  19       A.    I don't understand your question,

04:09  20  Counselor.  I mean we had a phone call with Bassil

04:09  21  once.  And we had a phone call with you once.  So I

04:09  22  don't know why you would say, "do you know if --

04:09  23  that we could help you" or -- we engaged you in two

04:10  24  phone calls.  We engaged your attorney in a phone

04:10  25  call.  And we had a phone call with you.

                                                              174

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

04:10  1       Q.   We'll get to that.  I'm not -- I'm not

04:10  2   under oath.  So I'm not going to testify here.  But

04:10  3   I want an answer to my question, sir?

04:10  4       A.   Okay.

04:10  5       Q.   Did you -- withdrawn.

04:10  6            When Ms. Yamada was responding to this

04:10  7   email on March 28th, 2018, after Guy -- after

04:10  8   withdrawn.

04:10  9            After my wife said "Guy does some IP work.

04:10  10  He is going to ask around and see if he knows

04:10  11  anybody to help out with this."

04:10  12           Do you know whether Ms. Yamada was

04:10  13  contacting my wife and I for a referral for an

04:10  14  attorney?

04:10  15      A.   I think she contacted your wife for -- to

04:10  16  either see if we can engage you or get a referral.

04:10  17  I think it was both.

04:10  18           Does that make sense?

04:10  19           She was looking for recommends knowing

04:11  20  that you practiced IP law and she knew you.

04:11  21      Q.   As far as you know, did my wife ever give

04:11  22  you any reason to believe that we were willing to

04:11  23  represent MGP?

04:11  24      A.   Your wife didn't know.

04:11  25      Q.   As far as you know, did I ever give you a

                                                            175

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

04:11  1    basis for saying that I was willing to represent

04:11  2    MGP?

04:11  3         A.   We engaged in two phone calls.  So --

04:11  4         Q.   So --

04:11  5         A.   So, yes.  So, yes.  That -- that

04:11  6    engagement opened the door to us that there was

04:11  7    interest.

04:11  8         Q.   You are saying that the phone call that

04:11  9    you believe you had with me?

04:11  10         A.   That I know I had with you.

04:11  11         Q.   Okay.  That opened up your belief that --

04:11  12    withdrawn.

04:11  13              The phone call that you know you had with

04:11  14    me, that's what led to you believing that I was

04:11  15    willing to consider to represent you?

04:11  16         A.   It was a -- yes.  That's correct.  And --

04:11  17         Q.   And --

04:11  18         A.   And it was a series, I'm not done

04:12  19    answering.  And it was not just one phone call, it

04:12  20    was a phone call with Bassil  -- is Bassil [phonetic

04:12  21    emphasis] or Bassil?

04:12  22         Q.   It's Bassil?

04:12  23         A.   Bassil with two Ss?

04:12  24         Q.   Yes.

04:12  25         A.   It was a phone call with Bassil who then

                                                              176

** ROUGH TRANSCRIPT **

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

04:12  1   we said "We need a phone call with Guy."  And we had

04:12  2   two phone calls.  We had a phone call with Bassil

04:12  3   and we had a phone call with you.

04:12  4       Q.   I'm sorry.  Now you are saying there were

04:12  5   two phone calls?

04:12  6       A.   That's correct.

04:12  7       Q.   I think earlier you said there was one

04:12  8   phone call that involved Bassil, myself, Torina --

04:12  9       A.   That was the final phone call.  But we had

04:12  10  a preliminary phone call with Bassil to see if it

04:12  11  was something they could do and Bassil suggested in

04:12  12  writing, in an email that we need --

04:12  13      Q.   You have got to let --

04:12  14      A.   I am trying to finish answering the

04:12  15  question you are answering -- you asked me.  I'm not

04:12  16  done.  You asked, and I am answering you.

04:12  17           It was an initial phone call -- you asked

04:12  18  me originally if I had a phone call with you.  And I

04:12  19  said, yes.  And I said it was four parties on that

04:12  20  phone call.  And that's the answer I gave you.

04:12  21           There was -- there was a preliminary phone

04:13  22  call with Bassil before that.  That's on our

04:13  23  calendar that we had.  And then Bassil said we are

04:13  24  going to need Guy on a call, we'll schedule it.  And

04:13  25  then we had a call.

177

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

04:15  1   phone call itself, is there anything that you can

04:16  2   point to where I have led you to believe that I was

04:16  3   interested in representing you?

04:16  4       A.   Well, after you heard about our business

04:16  5   model and how we -- how we explain -- because we

04:16  6   tried to get you to work with us.

04:16  7            You told us at the time that because of

04:16  8   the baby, you couldn't take on any new client's at

04:16  9   this time.

04:16  10           So you turned us down in the end, but we

04:16  11  did have two discovery calls with me regarding our

04:16  12  business.

04:16  13      Q.   Apart from the fact that you say you had a

04:16  14  follow-up call where I was involved, apart from that

04:16  15  specific fact, is there anything that I have done

04:16  16  that led you to believe that I was willing to

04:16  17  represent you or MGP?

04:16  18      A.   The second phone call would have been the

04:16  19  thing telling me that you were possibly willing to

04:16  20  represent us.

04:16  21      Q.   And apart from that second phone call,

04:16  22  anything else?

04:16  23      A.   Obviously not.

04:16  24      Q.   All right.

04:16  25      A.   We don't have a retainer agreement.  So

                                                          181

** ROUGH TRANSCRIPT **

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

04:16  1   obviously not.

04:16  2        Q.   Okay.  And so have you been able to

04:17  3   find -- well, withdrawn.

04:17  4             You have already filed your motion to the

04:17  5   you court.

04:17  6             Do you understand that?

04:17  7        A.   Yeah.

04:17  8        Q.   And you didn't mention a second phone call

04:17  9   in your filing with the court; is that true?

04:17  10       A.   I don't know.  I would have to look at it

04:17  11  in front of me.

04:17  12       Q.   Okay.  It says what it says.  So we don't

04:17  13  have to argue about what it says.

04:17  14            Have you been able to find a document that

04:17  15  references this second phone call that you had with

04:17  16  me?

04:17  17       A.   Yes.

04:17  18       Q.   What document is that?

04:17  19       A.   We have an email with Bassil that says

04:17  20  that he is scheduling a call with you.

04:17  21       Q.   And what email is that?  Is that something

04:17  22  that has been produced to the court?

04:17  23       A.   I would have to ask counsel.

04:17  24            THE WITNESS:  Do you have a copy of that

04:17  25  email?

                                                              182

** ROUGH TRANSCRIPT **

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

04:17   1          MR. CARREON:  Yes.  I -- all the emails

04:17   2   that we have were included in the declaration in

04:17   3   filing with the court.

04:17   4          MR. RUTTENBERG:  So counsel, are you

04:17   5   representing there aren't any other emails with our

04:17   6   firm other than what was in the declaration?

04:17   7          THE WITNESS:  No.  Not that I am aware of.

04:17   8   No.

04:17   9          MR. RUTTENBERG:  Thank you.

04:17  10   BY MR. RUTTENBERG:

04:18  11      Q.   So I have shown you one email of the three

04:18  12   that were submitted.

04:18  13      A.   Yep.

04:18  14      Q.   Is there anything in that email that would

04:18  15   suggest that you are scheduling the follow-up call

04:18  16   with me?

04:18  17      A.   This email -- this email exchange is

04:18  18   between your wife and Torina, not the firm.  You

04:18  19   were cc'd on it.

04:18  20      Q.   And, in fact, the email at the very end of

04:18  21   the exchange says [as read]:

04:18  22          "We thought we spoke to Bassil and

04:18  23          Guy's office already.  We actually need

04:18  24          to have a follow-up call.  Guy, when

04:18  25          you have time, we would love to chat

                                                              183

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

04:30  1    that you had on April 13th, 2018?

04:30  2        A.   I don't have a specific conversation -- I

04:30  3    have about 20 calls a day.

04:30  4        Q.   I'm sorry.  You said "conversation."  I

04:30  5    think you misspoke.  So I'm going to try it one more

04:30  6    time.

04:30  7        Q.   Do you have a specific recollection of

04:30  8    your conversation with Mr. Madanat on April 13th,

04:30  9    2018?

04:30  10       A.   I don't have a specific recollection of

04:30  11   that.

04:31  12       Q.   You have been involved in a lot of

04:31  13   lawsuits.  You understand that a law firm is

04:31  14   approximately time for conflicts before they can be

04:31  15   engaged?

04:31  16       A.   Oh, yeah.

04:31  17       Q.   And you have spoken to law firms and they

04:31  18   sometimes say "don't give me any confidential

04:31  19   information before I run a conflict."

04:31  20            Have you heard lawyers say that to you?

04:31  21       A.   Yes.

04:31  22       Q.   Do you have a recollection, one way or

04:31  23   another, as to what Mr. Bassil Madanat said to you

04:31  24   on your first call with him?

04:31  25       A.   I don't believe he ran a conflict check of

197

** ROUGH TRANSCRIPT **

** ROUGH TRANSCRIPT **DAYNA HESTER, CSR 9970**

04:31   1   who our -- you know, of us or if we are -- have

04:31   2   litigation with any of your client's at the time.

04:31   3         Q.   It's your understanding that Mr. Madanat

04:31   4   did not run a conflict check?  Is that what you are

04:31   5   saying?

04:31   6         A.   Yes.

04:31   7         Q.   Do you know whether Mr. Madanat told you

04:31   8   specifically that you shouldn't share confidential

04:31   9   information because he hadn't run a conflicts check?

04:31  10         A.   I don't remember being told that at all.

04:31  11   And --

04:31  12         Q.   I'm sorry.  Do you remember one way or the

04:31  13   other?  Are you saying --

04:31  14         A.   I don't remember being told that one way

04:31  15   or another at all.  In most cases, most attorneys

04:32  16   ask to do the conflict check before they even get on

04:32  17   the phone call with you.

04:32  18         Q.   In this case, it looks like Ms. Yamada

04:32  19   asked to speak with one of my associates and you got

04:32  20   on the phone with one of associates.

04:32  21         A.   Yes.

04:32  22         Q.   Do you know whether my associate --

04:32  23   withdrawn.

04:32  24              You told me earlier that you have been on

04:32  25   calls with lawyers who said don't share confidential

                                                              198
** ROUGH TRANSCRIPT **